**FOR PUBLICATION**

```
            IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
                DIVISION OF ST. THOMAS AND ST. JOHN
```

|  |  |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>CARLOS MIRANDA-FREYTES, a/k/a )<br>MANUEL INOA a/k/a MARIO CABRERA, )<br>)<br>Defendant. )<br>_____ ) | Criminal No. 2008-15 |

**ATTORNEYS:**

**Ishmael A. Meyers, Jr., AUSA**
St. Thomas, U.S.V.I.
    *For the plaintiff.*

**Jesse A. Gessin, AFPD**
St. Thomas, U.S.V.I.
    *For the defendant.*

## MEMORANDUM OPINION

**GÓMEZ, C.J.**

Before the Court is the motion of the defendant, Carlos Miranda-Freytes a/k/a Manuel Inoa a/k/a Mario Cabrera ("Miranda-Freytes"), to suppress statements he made to law enforcement officers, fingerprint evidence, and his immigration file.

### I. FACTUAL AND PROCEDURAL BACKGROUND

Miranda-Freytes was charged in May, 2008 in a one-count indictment of entering the United States after having been

*United States v. Miranda-Freytes*
Criminal No. 2008-15
Memorandum Opinion
Page 2

previously excluded, deported and removed, in violation of Title 8, Section 1326(a) of the United States Code.

The Court held a hearing on Miranda-Freytes' motion on June 25, 2008. At that hearing, the following facts were presented. On April 12, 2008, Gaston Eugene Tuckett ("Tuckett"), a security guard, was stationed as a shift supervisor at the Red Hook marine terminal on St. Thomas, U.S. Virgin Islands. On that day, a passenger ferry arrived from St. John, U.S. Virgin Islands. At that time, Customs and Border Patrol ("CBP") officers were present at Red Hook.[1] When the last passenger had disembarked, a passenger with whom Tuckett had some familiarity told Tuckett that a person had entered the engine room.[2] Tuckett then shared this information with CBP officer Richard Peak ("Peak") and the first mate of the vessel. Thereafter, Peak and the first mate boarded the vessel to investigate.

Peak and the crew member looked around the boat's lower and upper decks. They then went below-deck to the engine room. Peak then entered the engine room and observed an individual lying on the floor behind some sort of equipment. He asked that

---

[1] The CBP officers were processing foreign nationals suspected of entering the United States by boat without inspection.

[2] Tuckett testified that passengers are prohibited from entering the engine room.

*United States v. Miranda-Freytes*
Criminal No. 2008-15
Memorandum Opinion
Page 3

individual, who was later identified as Miranda-Freytes, to step out from behind the equipment and handcuffed him.[3] Peak then asked Miranda-Freytes about his status and nationality. Miranda-Freytes answered that he was not in the United States legally.[4]

Peak subsequently escorted Miranda-Freytes off the boat, patted him down to ensure that he was unarmed, and notified Immigrations and Customs Enforcement ("ICE"). At that point, another CBP officer asked Miranda-Freytes about his status and nationality. Miranda-Freytes again answered that he was in the United States illegally. The CBP officers thereafter transported Miranda-Freytes to an ICE office in another area of St. Thomas.

While at the ICE office, Special Agent Michael Kean ("Kean") administratively processed Miranda-Freytes. Miranda-Freytes filled out informational forms and had his fingerprints taken. His fingerprints were run through a computer system. The result of that search indicated that Miranda-Freytes had been arrested in New York on drug charges and had been deported in July, 2003. Kean notified Miranda-Freytes of these findings and had an interpreter read Miranda-Freytes his *Miranda* rights in Spanish, Miranda-Freytes' native language. Miranda-Freytes then stated

---

[3] Peak testified that he handcuffed the individual for officer safety.

[4] Peak testified that Miranda-Freytes did not make any other statements at this point.

*United States v. Miranda-Freytes*
Criminal No. 2008-15
Memorandum Opinion
Page 4

that he wished to waive his rights.  Miranda-Freytes acknowledged his previous arrest on drug charges and prior deportation, and stated that he had returned to the United States to provide for his sick brother in the Dominican Republic.

Miranda-Freytes now moves to suppress the statements he made to CBP and ICE officers, fingerprint evidence, and his immigration file.

## II. DISCUSSION

**A.  Statements**

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V.  The "inherently coercive" environment created by police custodial interrogation threatens the exercise of the Fifth Amendment privilege against self-incrimination. *New York v. Quarles*, 467 U.S. 649, 654 (1984).  When a defendant is subject to custodial interrogation by the police, procedural safeguards are necessary to preserve the defendant's Fifth Amendment privilege against compelled self-incrimination. *Miranda v. Arizona*, 384 U.S. 436, 479 (1966) (holding that absent procedural safeguards, there is an irrebuttable presumption of coercion when a defendant is interrogated while in police custody).  Accordingly, the police may not interrogate a defendant who is in custody unless they

*United States v. Miranda-Freytes*
Criminal No. 2008-15
Memorandum Opinion
Page 5

have first adequately advised him of his rights. *Id.* If the police interrogate a defendant in custody without first giving sufficient warnings, the defendant's Fifth Amendment privilege against self-incrimination may be threatened. *Id.*

"[I]nterrogation relating to one's identity or a request for identification by the police does not, by itself, constitute a Fourth Amendment seizure." *INS v. Delgado*, 466 U.S. 210, 216 (1984). "So long as a reasonable person would feel free 'to disregard the police and go about his business,' the encounter is consensual and no reasonable suspicion is required." *Florida v. Bostick*, 501 U.S. 429, 434 (1991) (quoting *California v. Hodari D.*, 499 U.S. 621, 628 (1991)). In other words, "the police can be said to have seized an individual only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed he was not free to leave." *Michigan v. Chesternut*, 486 U.S. 567, 573 (1988) (internal quotation omitted).

"A seizure occurs when there is either (a) 'a laying on of hands or application of physical force to restrain movement, even when it is ultimately unsuccessful,' or (b) submission to 'a show of authority.'" *United States v. Brown*, 448 F.3d 239, 245 (3d Cir. 2006) (citation omitted). "Put another way, when a seizure is effected by even 'the slightest application of physical force,' it is immaterial whether the suspect yields to that

*United States v. Miranda-Freytes*
Criminal No. 2008-15
Memorandum Opinion
Page 6

force." *Id.* (citation omitted). "In contrast, if a suspect in the absence of physical force does not submit to an officer's show of authority, there is no seizure and no Fourth Amendment claim." *Id.* (citation omitted). "[T]he test for existence of a 'show of authority' is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person." *Hodari D.*, 499 U.S. at 628.

Here, there can be no dispute that Miranda-Freytes was not free to leave when Peak asked about his immigration status. Miranda-Freytes was standing alone in the engine room of the boat in handcuffs, while Peak -- and possibly a member of the boat's crew -- stood by. It was under these circumstances that Peak asked Miranda-Freytes about his immigration status.

In *Adams v. Williams*, the Supreme Court explained that "the Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape." 407 U.S. 143, 145 (1972). Rather, "it may be the essence of good police work to adopt an intermediate response." *Id.* at 145-46. Thus, in *Terry v. Ohio*, the Court held that an investigatory stop is consistent with the Fourth Amendment whenever the police officer has a reasonable,

*United States v. Miranda-Freytes*
Criminal No. 2008-15
Memorandum Opinion
Page 7

articulable suspicion that criminal activity is afoot. 392 U.S. 1, 30 (1968).

The Third Circuit has explained the "reasonable suspicion" analysis as follows:

> Reasonable suspicion is an elusive concept, but it unequivocally demands that the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity. An officer's objective basis for suspicion must be particularized because the demand for specificity in the information upon which police action is predicated is the central teaching of this Court's Fourth Amendment jurisprudence. At the same time, we must allow officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person. In evaluating whether there was an objective basis for reasonable suspicion, we consider the totality of the circumstances-the whole picture.

*Brown*, 448 F.3d at 246-47 (internal quotations and citations omitted).

The Court must apply these standards to determine whether there was an articulable basis for Peak's investigative stop of Miranda-Freytes. *See Johnson v. Campbell*, 332 F.3d 199, 205 (3d Cir. 2003). In considering the relevant factors, the "ultimate determination of reasonable suspicion requires [the Court] to consider these items not 'in isolation from each other,' but (as noted) as part of the 'totality of the circumstances.'" *Brown*,

*United States v. Miranda-Freytes*
Criminal No. 2008-15
Memorandum Opinion
Page 8

448 F.3d at 247 (quoting *United States v. Arvizu*, 534 U.S. 266, 274 (2002)).

    Here, Peak was in the midst of processing foreign nationals suspected of entering the United States by boat without inspection when he received word from Tuckett that a person had entered the vessel's engine room, a place that was off-limits to everyone but crew members. Miranda-Freytes' presence in that location is one factor on which Peak could have based his reasonable suspicion that criminal activity was afoot. *See, e.g.*, United *States v. Yang*, 286 F.3d 940, 950 (7th Cir. 2002) (finding that law enforcement "had a reasonable suspicion that criminal activity was occurring" where, among other things, the suspect was in a "highly restricted . . . area"). Peak reasonably could have perceived Miranda-Freytes' act of concealing himself behind a piece of equipment in a restricted area as furtive or evasive. *See, e.g., United States v. Powell*, 176 Fed. Appx. 267, 269 (3d Cir. 2006) (unpublished) (affirming the denial of a suppression motion where the record showed, *inter alia*, that the defendant had displayed "furtive movements"), *cert. denied*, 127 S. Ct. 151 (2006); *United States v. Smith*, 396 F.3d 579, 584 (4th Cir. 2005) ("[W]e have repeatedly recognized that evasive reactions to the presence of police may be considered in determining whether reasonable suspicion exists for an investigatory stop.")

*United States v. Miranda-Freytes*
Criminal No. 2008-15
Memorandum Opinion
Page 9

(citations omitted), *cert. denied*, 545 U.S. 1122 (2005); *Valdez v. McPheters*, 172 F.3d 1220, 1226 (10th Cir. 1999) (reasoning that "officers may take into account the fact that a person involved in criminal activity may be attempting to conceal his whereabouts"); *U.S. ex rel. Richardson v. Rundle*, 461 F.2d 860, 864 (3d Cir. 1972) (noting that "the significance of furtive actions . . . is . . . applicable to" *Terry* stops, and may constitute the basis of individualized suspicion sufficient to justify a *Terry* stop), *cert. denied*, 410 U.S. 911 (1973).

In short, the Court finds that the totality of the circumstances clearly gave Peak reasonable suspicion to detain Miranda-Freytes under *Terry*.

During a *Terry* stop, law enforcement officers "may take such steps as are 'reasonably necessary to protect their personal safety and to maintain the status quo.'" *United States v. Edwards*, 53 F.3d 616, 619 (3d Cir. 1995) (quoting *United States v. Hensley*, 469 U.S. 221, 235 (1985)). The use of handcuffs does not necessarily exceed the bounds of a *Terry* stop. *See Houston v. Clark County Sheriff Deputy John Does 1-5*, 174 F.3d 809, 813 (6th Cir. 1999).

Here, for many of the same reasons that Peak had reasonable suspicion that Miranda-Freytes was involved in criminal activity, Peak could also have reasonably believed that his safety was

threatened. Peak came upon an unknown individual -- indeed, apparently unknown even to the first mate of the vessel -- in an area that was off-limits to non-crew. That individual was lying down in an engine room, apparently trying to avoid detection. The use of handcuffs to maintain the status quo and secure the scene, under these circumstances, was well within the scope of *Terry*. *See United States v. Shareef*, 100 F.3d 1491, 1507 (10th Cir. 1996); *United States v. Burton*, 193 F.R.D. 232, 239 (E.D. Pa. 2000) ("All of these factors, . . . taken together, suggest that, in light of common sense and ordinary human experience, the police were justified in using handcuffs during the *Terry* stop.").

Incident to a valid *Terry* stop, police officers are entitled to ask questions of a suspect "as long as the[y] . . . do not convey a message that compliance with their requests is required." *Florida v. Bostick*, 501 U.S. 429, 435 (1991). The record in this matter does not suggest that any such message was conveyed. Nor does Miranda-Freytes contend that he felt constrained to answer Peak's questions. As such, Peak's questioning did not by itself transform an otherwise lawful stop into a custodial scenario. *See*, *e.g.*, *Ohio v. Robinette*, 519 U.S. 33 (1996); *United States v. Childs*, 277 F.3d 947, 954 (7th Cir. 2002) (en banc) (holding that the nature of the second question

*United States v. Miranda-Freytes*
Criminal No. 2008-15
Memorandum Opinion
Page 11

posed by an officer -- whether the suspect was carrying any marijuana -- did not convert an otherwise permissible traffic stop detention into a custodial interrogation), *cert. denied*, 537 U.S. 829 (2002). Indeed, the credible and unrebutted testimony at the suppression hearing indicates that Miranda-Freytes voluntarily answered Peak's questions. *See*, *e.g.*, *United States v. Francis*, 140 Fed. Appx. 184, 187 (11th Cir. 2005) (not for publication) (concluding that the defendant was not in custody where the record showed that he had "voluntarily consented to answer the officer's questions"), *cert. denied*, 546 U.S. 1045 (2005). Accordingly, Miranda-Freytes' answer to Peak while aboard the vessel will not be suppressed.

Once Miranda-Freytes answered Peak's question about his immigration status, Peak had probable cause to believe that Miranda-Freytes had committed a crime. *See*, *e.g.*, *United States v. Muhammad*, 120 F.3d 688, 696 (7th Cir. 1997) ("Probable cause [to arrest] exists when at the moment an arrest is made officers have 'facts and circumstances within their knowledge and of which they [have] reasonably trustworthy information' that would sufficiently 'warrant a prudent man in believing that the [suspect] had committed or was committing the offense.'") (alterations in original) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)); *United States v. Brady*, 819 F.2d 884, 889 (9th Cir.

*United States v. Miranda-Freytes*
Criminal No. 2008-15
Memorandum Opinion
Page 12

1987) (finding that officers had probable cause based on the detainee's answer affirmative answer to the question whether he had a gun in his car), *cert. denied*, 484 U.S. 1068 (1988). Consequently, any further questioning of Miranda-Freytes after his initial answer to Peak about his immigration status should have been preceded by a *Miranda* warning.

Once on the dock, another CBP officer asked Miranda-Freytes the same questions regarding his immigration status. Miranda-Freytes gave the same answers to that officer as to Peak. Because Miranda-Freytes' answers to that questioning were uttered without the protection of *Miranda* warnings, those answers must be suppressed.

Miranda-Freytes was subsequently transported to an ICE office for administrative processing with Kean. In the course of that processing, Miranda-Freytes filled out various administrative forms and his fingerprints were taken. The results of a database search indicated that Miranda-Freytes had been previously been deported. Kean notified Miranda-Freytes of his findings. Before discussing those findings, Kean had an interpreter read Miranda-Freytes his *Miranda* rights in Spanish and gave Miranda-Freytes an advice of rights form. Miranda-Freytes initialed that form line-by-line to show his comprehension. Miranda-Freytes thereafter made additional

*United States v. Miranda-Freytes*
Criminal No. 2008-15
Memorandum Opinion
Page 13

statements about his previous arrest in New York on narcotics charges and his prior deportation from the United States.

"A defendant may waive his *Miranda* rights if the waiver is made knowingly, intelligently, and voluntarily." *United States v. Pruden*, 398 F.3d 241, 246 (3d Cir. 2005) (citing *Miranda*, 384 U.S. at 444). There are two factors to consider in determining the effectiveness of a *Miranda* waiver:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived.

*Moran v. Burbine*, 475 U.S. 412, 421 (1986).

The credible, unrebutted testimony at the suppression hearing demonstrates that Miranda-Freytes understood the *Miranda* warning. That testimony further shows that after having been advised of his rights, Miranda-Freytes voluntarily made statements to Kean about his prior deportation. The record is totally bereft of any indication of coercion on the part of Kean or incomprehension on the part of Miranda-Freytes. Rather, all signs indicate that Miranda-Freytes' statements at the ICE office were the "product of rational intellect and free will." *See*,

*United States v. Miranda-Freytes*
Criminal No. 2008-15
Memorandum Opinion
Page 14

*e.g.*, *United States v. Bethancourt*, 65 F.3d 1074, 1078 (3d Cir. 1995). Accordingly, Miranda-Freytes' statements to Kean will not be suppressed.

**B. Fingerprints**

In *Pennsylvania v. Muniz*, 496 U.S. 582, 601 (1990), the Supreme Court stated that the holding in *Miranda* does not extend to "routine booking" questions asked to secure "biographical data necessary to complete booking or pretrial services."

In this matter, there is no evidence to suggest that the taking of Miranda-Freytes' fingerprints was anything more than part of a routine administrative procedure. Indeed, Kean expressly testified that his taking of those fingerprints was a product of routine administrative processing. The circumstances in which Miranda-Freytes was transferred to ICE support that testimony. The record reflects that Peak informed Kean that Miranda-Freytes had been in the United States unlawfully for approximately two months, and that arrangements had to be made to turn Miranda-Freytes over to ICE for administrative processing. There is simply no suggestion in the record that, in taking Miranda-Freytes' fingerprints, Kean was even partially motivated by an investigative, rather than an administrative, purpose. As such, the motion will be denied with respect to Miranda-Freytes' fingerprints.

*United States v. Miranda-Freytes*
Criminal No. 2008-15
Memorandum Opinion
Page 15

**C.   Immigration File**

In *United States v. Bowley*, the Third Circuit addressed the question whether evidence that the government seeks to introduce regarding a defendant's true identity and his prior deportation may be suppressed:

> Although we have not previously addressed this precise question, a number of other courts of appeals have addressed it, and each has refused to suppress a defendant's immigration file or identity in the context of a criminal prosecution for illegal reentry in violation of § 1326.  Furthermore, an alien charged with illegal reentry has no possessory or proprietary interest in his/her immigration file or the documentary evidence contained in that file.  Similarly, an alien has no reasonable expectation of privacy in a file that is maintained solely by a government agency for official purposes and kept in the custody of that agency.

435 F.3d 426, 430-31 (3d Cir. 2006) (internal citations omitted). Based on that rationale, the *Bowley* Court held that "the Fourth Amendment does not provide a basis for an alien to suppress his/her immigration file, or information in that file." *Id*. at 431.

In *Bowley*, the court left open the possibility that an immigration file could be suppressed where there are "egregious violations of Fourth Amendment or other liberties that might transgress notions of fundamental fairness and undermine the probative value of the evidence obtained." *Id.* at 430 (quoting *INS v. Lopez-Mendoza*, 468 U.S. 1032, 1039 (1984).  Neither the

*United States v. Miranda-Freytes*
Criminal No. 2008-15
Memorandum Opinion
Page 16

*Bowley* Court nor the *Lopez-Mendoza* Court defined an "egregious" violation. Whatever the definition, the Court is satisfied that no such violation has occurred in this matter. As such, the motion will be denied with respect to Miranda-Freytes' immigration file.

## IV. CONCLUSION

For the reasons given above, the Court will deny Miranda-Freytes' motion insofar as it seeks suppression of the statement to Peak while onboard the vessel, the statements to Kean, the fingerprints, and the immigration file. The Court will grant the motion to the extent it seeks suppression of the statements Miranda-Freytes made to the CBP officer on the dock. An appropriate Order follows.

S_____
      CURTIS V. GÓMEZ
        Chief Judge

**FOR PUBLICATION**

IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS AND ST. JOHN

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) ) ) | |
|  | ) | Criminal No. 2008-15 |
| v. | ) ) | |
| CARLOS MIRANDA-FREYTES, a/k/a MANUEL INOA a/k/a MARIO CABRERA, | ) ) ) | |
| Defendant. | ) ) | |

ATTORNEYS:

**Ishmael A. Meyers, Jr., AUSA**
St. Thomas, U.S.V.I.
   *For the plaintiff.*

**Jesse A. Gessin, AFPD**
St. Thomas, U.S.V.I.
   *For the defendant.*

<u>ORDER</u>

**GÓMEZ, C.J.**

Before the Court is the motion of the defendant, Carlos Miranda-Freytes a/k/a Manuel Inoa a/k/a Mario Cabrera ("Miranda-Freytes"), to suppress statements he made to law enforcement officers, fingerprint evidence, and his immigration file. For the reasons stated in the accompanying Memorandum Opinion of even date, it is hereby

**ORDERED** that the motion is **DENIED** insofar as it seeks

*United States v. Miranda-Freytes*
Criminal No. 2008-15
Order
Page 2

suppression of the statement to Peak while onboard the vessel, the statements to Kean, the fingerprints, and the immigration file; it is further

**ORDERED** that the motion is **GRANTED** to the extent it seeks suppression of the statements Miranda-Freytes made to the CBP officer on the dock; and it is further

**ORDERED** that the statements Miranda-Freytes made to the CBP officer on the dock will be **SUPPRESSED** from the government's case in chief at trial.

S\ _____
    **CURTIS V. GÓMEZ**
       **Chief Judge**